# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM PEARSON, | ) 1:06cv0826 DLB |
| | ) |
| Plaintiff, | ) ORDER REGARDING PLAINTIFF'S<br>) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| MICHAEL J. ASTRUE, Commissioner<br>of Social Security, | ) |
| Defendant. | ) |

## **BACKGROUND**

Plaintiff William Pearson ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for supplemental security income and disability insurance benefits pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On October 25, 2006, the Honorable Oliver W. Wanger reassigned the case to the undersigned for all purposes.

1

# FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed his applications on October 17, 2003, alleging disability since April 10, 2002, due to "diabetes, intermittent seizures, shakes and dizziness, hypoglycemic, blackouts." AR 52-55, 67-73.  After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 33-36, 41-45, 46.  On September 20, 2004, ALJ Jan Donsbach held a hearing.  AR 482-491.  ALJ Donsbach denied benefits on September 24, 2004.  AR 16-24.  The Appeals Council denied review on May 5, 2006.  AR 5-8.

Hearing Testimony

ALJ Donsbach held a hearing on September 20, 2004, in Long Beach, California. Plaintiff appeared with his attorney, Dennis Devermont.  Vocational expert ("VE") E.T. Kurata also appeared and testified.  AR 482.

Plaintiff testified that he was 55 years old at the time of the hearing and had a high school diploma.  AR 484.  He did security work from 1986 through 1996, and last worked in 2002.  He stopped working because he was having a lot of seizures and couldn't function right.  AR 485. His position involved standing in a booth and walking around, and he was unarmed.  AR 487. He testified that he had many seizures on the job where he fell and hit his head on the cement. AR 488.  He admits that he was let go from a security position in 2002 because he took too many breaks to urinate.  Plaintiff explained that he had to urinate every hour, on the hour, and that he tried to tell his employer but he wouldn't listen.  AR 488.

Plaintiff explained that he has two to three seizures per month and that he doesn't always go to the hospital.  AR 485.  During a grand mal seizure, he blacks out.  He sometimes loses bladder control, but not bowel control.  AR 486.  He bites his tongue every time and injures his arms.  AR 486.  He takes medicine for his seizures that makes him constantly drowsy.  AR 487.

Plaintiff also has diabetes, for which he takes pills.  His diabetes causes him to not feel well.  AR 486.  He also has high blood pressure that is "somewhat" controlled by medication.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

AR 487.  He has "intermittent shakes" during which he can't hold anything.  He demonstrated at the hearing and indicated that it happened daily.  AR 487.

When questioned about a report that indicated that his tremors were caused by medication, Plaintiff testified that he needed the medication to "slow down" the tremors and that they'd be much worse without it.  AR 488.

The VE testified that Plaintiff's past work as a security guard was light work.  AR 489.  A person with a light residual functional capacity ("RFC") and seizure precautions would be able to perform the position of security guard.  AR 490.

During questioning by Plaintiff's attorney, the VE testified that a person who had two seizures a month could not work.  AR 490.  If this person had a urinary problem that required him to use the restroom once every hour, this person could not perform a normal, competitive position.  AR 491.

Medical Record

Plaintiff's primary health care provider was the Veterans Administration ("VA") in Long Beach.  AR 144-159.  From April 2002 to January 2004, he was treated for hypertension, diabetes type II, epilepsy (tonic-clinic), chronic sinusitis and hyperlipidemia with medications and instructions for diet and lifestyle changes.  AR 145, 150, 152.

On July 10, 2002, records indicate that control of his diabetes was worsening because he was not eating well since he became unemployed.  AR 144.

On October 1, 2002, Plaintiff was taken to St. Mary Medical Center by ambulance for a head injury after seizure activity.  He was diagnosed with "seizure disorder, non-compliant with medications" and released the same day.  AR 119-127.  His blood level of Valproic Acid was less than one mcg/mL.  The therapeutic level is 50 to 100 mcg/mL.  AR 126.

On March 5, 2003, Plaintiff saw Mark Borigini, M.D., for an internal medicine consultation.  Plaintiff reported that he was diagnosed with diabetes in 1995, with no known renal or retinal involvement and no numbness or tingling of his feet.  His seizures began in 1995 and were associated with hypoglycemia.  Plaintiff reported that he had one seizure in 2000 and one in 2001.  He also complained of an occasional tremor in his right hand, as well as

hypertension since 1995 and hyperlipidemia.  Plaintiff reported that he last worked as a security guard in April 2002 and tries to walk 7-12 blocks a day for exercise.  AR 128-129.

Plaintiff's examination was within normal limits, including all aspects of his neurological examination.  129-130.  Dr. Borigini diagnosed a history of diabetes with no known end-organ involvement, history of seizure disorder with no neurologic deficit, a history of intermittent right hand tremor of which Dr. Borigini saw no sign, a history of hypertension and a history of hyperlipidemia.  Dr. Borigini opined that Plaintiff could stand and walk for six hours, with appropriate breaks.  He could bend and crouch and perform fine manipulation with his hands, at least based on this examination.  Dr. Borigini saw no limitation in lifting except for Plaintiff's general strength.  In light of his seizure disorder, appropriate precautions should be taken.  AR 131.

A chest x-ray performed on March 5, 2003, was normal.  AR 132.

Plaintiff's Depakene level was abnormally high on March 5, 2003.  The therapeutic range was 50 to 100 ug/mL.  Plaintiff's level was 107.3 ug/mL.  AR 134.

On March 8, 2003, Plaintiff underwent a psychiatric evaluation performed by Barry Edelman, M.D.  Plaintiff had difficulty formulating a chief psychiatric complaint.  He reported that he has been functioning as a part-time minister and has not had any difficulty.  He also complained that he had been chronically depressed and anxious about his financial status.  He was eating and sleeping well, but reported a decline in his concentration.  Plaintiff was taking Depakote for seizures associated with his low blood sugars.  He further reported that he lives alone and is able to dress, bath and perform some chores, errands shopping, driving and cleaning.  Plaintiff further reported that he stopped working in April 2002 because the position was not needed anymore.  He has a bachelor's degree from a theology college and received an honorable discharge from the army.  AR 135-137.

On mental status examination, Plaintiff's psychomotor activity was within normal limits and although he reported a depressed mood, his affect was personable.  His thought content and process were normal.  His memory and concentration were largely intact and he demonstrated a fair fund of knowledge.  Dr. Edelman diagnosed depressive disorder, not otherwise specified and

assigned a Global Assessment of Functioning score of 70. He opined that Plaintiff could understand, remember and follow complex instructions. He would be able to maintain concentration at work and would be able to maintain adequate pace. He could interact sufficiently with peers, the public and supervisors. His prognosis from a psychiatric perspective was good. AR 137-139.

On March 20, 2003, State Agency physician Joel Ross, M.D., completed a Physical Residual Functional Capacity Assessment. He opined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk for about six hours in an eight hour day, and sit for about six hours in an eight hour day. Plaintiff could occasionally, or as little as possible, climb ramps and stairs and balance. He could never climb ladders, ropes or scaffolds. He could frequently stoop, kneel, crouch and crawl. He was limited in fine manipulation with his right hand and should avoid power tools and dangerous machinery. AR 178-185. The light RFC with seizure precautions and no fine motor activities was affirmed on February 11, 2004. AR 186.

On March 24, 2003, State Agency physician Michael Skopec, M.D., opined that Plaintiff's depressive disorder, not otherwise specified, was not a severe psychiatric impairment. AR 203. He had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence and pace. AR 213.

Treatment notes from the VA dated June 18, 2003, indicate that Plaintiff was homeless due to his loss of employment. He works with the church, but does not receive compensation. He was to begin receiving unemployment compensation in the amount of $314 biweekly. Plaintiff applied for Social Security disability, but "prefers to work" and his disability application was "just a back up plan." Plaintiff thought he could work and will "gladly return to a security guard position." AR 148.

On July 1, 2003, Anthony Jackson, M.D., completed a Physical Residual Capacity Questionnaire. He stated that he had treated Plaintiff monthly, and last saw him on July 1, 2003. He opined that Plaintiff's depression and anxiety affect his physical condition, and he was

moderately limited in his ability to deal with work stress.  From a physical standpoint, Plaintiff could walk for four blocks without rest, sit for 30 minutes at a time and stand for 20 minutes at a time.  During an eight hour day, he could sit for less than two hours and stand for less than two hours.  He needed to walk around for five minutes at a time every 30 minutes.  When sitting for a prolonged period, he had to elevate his feet.  He did not need a cane and could lift 10 pounds occasionally.  He had significant limitations in performing repetitive reaching, handling and fingering and could never twist or bend.  He was likely to have good days and bad days and could be expected to be absent about once a month.  AR 140-143.  Dr. Jackson indicated that these limitations existed since 1985.  AR 143.

On September 22, 2003, Plaintiff was seen at the emergency room at Long Beach Memorial Medical Center after he had a seizure.  He reported that his last seizure was in October 2002.  His level of Valproic acid was low and he was hypoglycemic.  AR 170-172.  He was discharged in good condition that day.  AR 172.

Plaintiff went to the emergency room at Long Beach Memorial Medical Center on November 18, 2003, complaining of abdominal pain, headache and dizziness.  Raynard Sebastian, M.D., examined Plaintiff and noted that his complaints of pain were out of proportion to the exam.  "When you barely touch his abdomen, he states that it hurts a lot.  This is not done with any significant pressure on the abdomen."  A CT scan of the chest and abdomen were normal, and blood tests revealed only mild hypoglycemia.  Plaintiff was given morphine, which significantly reduced his pain.  He was also given Dulcolax for constipation.  He was diagnosed with abdominal pain of unclear etiology.  Dr. Sebastian concluded that given his normal studies, he could be followed as an outpatient with his primary care physician.  AR 160-162.

Plaintiff saw Thomas P. DiJulio, M.D., for a neurological consultation on January 29, 2004.  Plaintiff reported that he managed his diabetes with medication and diet and denied problems with vision, parethesias or urinary symptoms.  He further reported that he had five or six seizures last year, and that his last one was a few months ago.  Plaintiff reported that he has no warning prior to his seizures and that he just blacks out and usually finds himself at the hospital.  He stated that he bites his tongue but has had no urinary incontinence.  Plaintiff told

1  Dr. DiJulio that he was let go from his position in April 2002 because he took too many breaks to
2  urinate. AR 176-177.
3       During his physical examination, finger-to-nose testing demonstrated a prominent action
4  tremor in both hands. Dr. DiJulio diagnosed diabetes with no end organ involvement, grand mal
5  seizure disorder by history, and action tremor probably secondary to Divalproex. Based on his
6  examination and review of the record, he opined that Plaintiff could stand/walk for eight hours
7  cumulatively with breaks every hour. He could sit for eight hours cumulatively with breaks
8  every hour. His action tremor is likely to improve or resolve if he switched to some other
9  anticonvulsant, but Plaintiff appeared to be incapable of performing many fine motor activities
10 without a great deal of effort. His lifting/carrying would also be mildly impaired from his
11 tremor, and Dr. DiJulio opined that he could lift 40 pounds occasionally, 20 pounds frequently.
12 Plaintiff could perform repetitive bending, stooping and reaching above the shoulder. AR 177.
13      On February 11, 2004, State Agency physician Kenneth D. Michael, M.D., opined that
14 Plaintiff did not have any severe psychiatric impairment. AR 189.
15      <u>ALJ's Findings</u>
16      After reviewing the medical record, the ALJ determined that Plaintiff's seizure disorder
17 was a severe impairment. He found Plaintiff not "entirely forthcoming about the frequency of his
18 seizures" and also found his allegations of limitations to be less than credible. AR 22. "Granting
19 Plaintiff the benefit of the doubt," he found that Plaintiff retained the RFC to perform light work
20 that would not expose him to heights, moving machinery or other workplace hazards. AR 22.
21 Based on the testimony of the VE, Plaintiff could return to his past work as an unarmed security
22 guard. AR 23.

23      **SCOPE OF REVIEW**
24      Congress has provided a limited scope of judicial review of the Commissioner's decision
25 to deny benefits under the Act. In reviewing findings of fact with respect to such determinations,
26 the Court must determine whether the decision of the Commissioner is supported by substantial
27 evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla,"
28 *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v.*

*Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3] Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of his disability; (2) has an impairment or a combination of impairments that is considered "severe" (seizure disorder) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does

---

[3] All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

8

not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; but (4) retains the RFC to perform his past relevant work.  AR 23-24.

Plaintiff argues that the ALJ improperly assessed his credibility.

## **DISCUSSION**

Plaintiff's sole argument is that the ALJ erred in assessing his credibility.  In so arguing, Plaintiff contends that the ALJ refused to consider his good work history and improperly analyzed his daily activities and his "desire to return to work."  Opening Brief, at 10.  Plaintiff contends that his testimony was consistent with the findings of Dr. DiJulio.

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints.  *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991).  "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment," *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (citation omitted).  In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)).  Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).  Where the ALJ does not find "'affirmative evidence' that the claimant was a malingerer, the reasons for rejecting the claimant's testimony must be clear and convincing." *Orn*, at 635.

"The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Thomas,* 278 F.3d at 958; (citing *Light v. Soc.*

*Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

As a threshold matter, to the extent that Plaintiff alleges error because the ALJ did not set forth the "required reasons" pursuant to SSR 96-7p, his argument fails. Although an ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the Social Security Agency's rules, *Orn,* at 635-636, SSR 96-7p does not set forth a mandatory procedure for assessing credibility. While courts give the SSRs some deference, they do not have the force of law. *Holohan v. Massanari,* 246 F.3d 1195, 1203, n. 1 (9th Cir. 2001).

Here, the ALJ began his credibility analysis by explaining that Plaintiff "has not been entirely forthcoming about the frequency of his seizures." AR 22. He continued,

> The evidence, including the claimant's own statements, indicate that the claimant has had no more than two seizures yearly; and only when not compliant with medication or diet. In August 2001, he reported that his last seizure was in January 2000 (Exhibit 11F/7). On a Seizure Report, the claimant indicated that he had seizures only on October 1, 2002, January 16, 2000, two in 1999 and two in 1998, not the frequent seizures he now alleges. On September 22, 2003, he said that his last seizure was nearly a year before, in October 2002 (Exhibit 7F/12). The claimant stated that his medications controlled his seizures "as long as I eat right" (Exhibit 4E/2). The claimant is also non-compliant with his diabetic regimen also and has mediocre/poor control of his hypertension. Nevertheless, he has no end organ damage and his kidney and liver tests are negative (Exhibit 6F/2).

AR 22.

The ALJ's recitation of the medical evidence is accurate. Plaintiff testified that he "had a lot of seizures" while working and therefore had to stop working in 2002. AR 485. Yet the medical evidence and his statements therein show that he had only one seizure in 2000, one in 2001, and, pursuant to his Seizure Questionnaire dated January 17, 2003, one in 2002 (in October). AR 83-85, 128-129. So, according to his prior statements, Plaintiff had only one seizure in 2002, *after* stopped working in April. The record also demonstrates that after the October 2002 seizure, he did not have another one until September 2003, almost one year later, yet he told Dr. DiJulio in January 2004 that he had five or six seizures in 2003 and that his last one was a few months ago. AR 171, 176-177. Plaintiff's statements about the frequency of his seizures are blatantly inconsistent and the ALJ was entitled to take that into account in his credibility analysis. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

The ALJ next examined the other inconsistencies in the record. AR 22. For example, despite Plaintiff's allegation that he cannot work, he is able to work as a minister. AR 77, 148. Similarly, in June 2003, Plaintiff told medical personnel at the VA that he "prefers to work" and that his disability application was "just a back up plan." AR 148. Plaintiff further stated that he thought he could work and would "gladly return to a security guard position." AR 148. The ALJ also noted that Plaintiff applied for, and received, unemployment benefits, which indicates that he was not fired and requires a certification that he is "ready, willing and able to work." AR 148. Elsewhere in his decision, the ALJ noted the different reasons Plaintiff gave as to why he stopped working. Although he testified that he was terminated because he took too many bathroom breaks and cited this reason to Dr. DiJulio, he told Dr. Edelman that he stopped working because the position was not needed anymore. AR 137, 176-177, 488. The ALJ may use "ordinary techniques" in addressing credibility. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), and may make inferences "logically flowing from the evidence." *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).

Plaintiff argues that the ALJ should have discussed his good work history, which he contends enhances his credibility. Plaintiff is correct that a good work history over an extended period of time is a factor that enhances credibility. *Thomas*, 278 F.3d at 959. However, it is only one factor of many that may be considered. Plaintiff explains that the ALJ ignored the fact that he worked for the prior 36 years, and that common sense dictates that "an individual who has performed three and one-half decades of continuous gainful activity does not simply wake up one day and decide not to show up for work anymore without a very good reason." Opening Brief, at 7. While Plaintiff may have a good work history, it is only one factor and does not tip the scales in favor of finding him credible given the other reasons cited by the ALJ. Nor does the ALJ's failure to cite to his work history constitute error. While the ALJ is directed to consider numerous factors, he does not have to include each and every factor in his written decision. Rather, the ALJ must cite appropriate factors that are sufficiently specific to permit the Court to conclude that he did not arbitrarily discredit Plaintiff's testimony. *Thomas,* 278 F.3d at 958.

The ALJ next examined Plaintiff's daily activities and concluded that he "performs a full range of daily activities," including cooking, cleaning and laundry. AR 22. He also works part time as a minister, takes daily walks, sometimes uses the bus, goes to church and visits with friends. AR 22, 77-81, 135-136. If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations. *Morgan v. Commissioner of Social Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

Plaintiff disagrees with the ALJ's analysis because he feels that his testimony is not consistent with the ability to perform regular, continuous full-time work. For example, he cites his need to use the restroom every hour, and Dr. DiJulio's opinion that he would need such an accommodation, as evidence that he *wants* to work but lacks the actual *ability* to work. He also classifies his daily activities as "meager." Opening Brief, 10. First, the ALJ's findings that his daily activities are more than "meager" is supported by his own testimony. Second, Plaintiff ignores the fact that most of the medical opinions, including that of Dr. DiJulio, conclude that Plaintiff can perform work activity. AR 131, 137-139, 176-177, 178-186, 203. Insofar as Plaintiff points to Dr. DiJulio's opinion that Plaintiff would need restroom breaks every hour, this limitation was based solely on Plaintiff's report. An ALJ may also reject the treating physician's opinion because it was based on the claimant's discredited subjective complaints. *Thomas v. Barnhart,* 278 F.3d 948, 957 (9th Cir. 2002); *Fair v. Bowen,* 885 F.2d 597, 605 (9th 1989).

Given the ALJ's analysis, this Court can conclude that he did not arbitrarily reject Plaintiff's testimony. Plaintiff may disagree with the outcome, but that does not render an otherwise supported analysis improper. "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, William Pearson.

IT IS SO ORDERED.

Dated: **September 24, 2007**           **/s/ Dennis L. Beck**
                                                                UNITED STATES MAGISTRATE JUDGE